## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR SEIZURE WARRANT

I, Satish Mathai, after being duly sworn, depose and state as follows:

## I.  ITEMS TO BE SEIZED

1.      This affidavit is in support of a seizure warrant for the following items:

    (a)      **the domain name huayetrade.com**;

    (b)      **the domain name jerseys-factory.com**;

    (c)      **any and all funds up to $845,289.86 in the PayPal Private Ltd. account jasonwholesale@gmail.com, bearing account number xxxxxxxxxxxxxx7276; and**

    (d)      **any and all funds up to $154,945.52 in the PayPal Private Ltd. account yu3ying@gmail.com, bearing account number xxxxxxxxxxxxxxx2866**.

## II.  AFFIANT'S EXPERIENCE

2.      I am a Special Agent ("SA") with the Department of Homeland Security, Immigration and Customs Enforcement ("ICE") assigned to Homeland Security Investigations ("HSI").  I have been employed by ICE for seven years.  I am currently assigned to the National Intellectual Property Rights Coordination Center ("IPR Center") as a National Program Manager in Crystal City, Virginia.  Prior to my employment with ICE, I was employed as a Customs Inspector with the Department of Homeland Security, Customs and Border Protection ("CBP"), for eight years.  I have received training at the Federal Law Enforcement Training Academy.  In the course of my employment with ICE, I have received training and have experience in the area of computer technology and intellectual property offenses.

3.      I am currently assisting the United States Department of Justice and the United States Attorney's Office for the District of Columbia in the investigation of a series of related web sites and associated individual(s) and entities that the investigation reveals are selling a variety of

trademarked goods bearing counterfeit marks to the public via their web sites.

4.      The information contained in this affidavit is based on my personal knowledge and observations accumulated during the course of this investigation, on information conveyed to me by other law enforcement personnel, and on my review of documents and interview reports.  The affidavit is submitted for the limited purpose of establishing probable cause in support of this application for a seizure warrant.  Thus, it does not contain every fact known by me or by the United States.

### III.  PURPOSE OF APPLICATION AND LEGAL DISCUSSION

5.      Special Agents at the IPR Center are investigating the importation, sale, and distribution of counterfeit consumer goods through web sites and using email addresses, specifically the domain names www.huayetrade.com and www.jerseys-factory.com ("the Subject Domain Names") and using the Paypal Private Ltd. accounts (referred to herein as "PayPal accounts") of jasonwholesale@gmail.com, bearing account number xxxxxxxxxxxxxxx7276, and yu3ying@gmail.com, bearing account number xxxxxxxxxxxxxxx2866 ("the Subject Funds").  As discussed in more detail below, there is probable cause to conclude that the Subject Domain Names constitute property used, or intended to be used, to commit or facilitate the commission of the offense of trafficking in counterfeit goods, services, or labels, in violation of Title 18, United States Code, Section 2320.  There is also probable cause to believe that the Subject Funds constitute or are traceable to the proceeds of trafficking in counterfeit goods.

6.      This Affidavit is submitted in support of seizure of the Subject Domain Names and the Subject Funds by civil and criminal seizure warrants.  I apply for warrants under both the civil and criminal provisions because the Subject Domain Names and the Subject Funds could easily be

2

removed from the reach of the Court and to ensure the availability of the Subject Domain Names

and the Subject Funds for forfeiture in the event of a conviction.  The Subject Domain Names and

the Subject Funds are subject to civil seizure and forfeiture pursuant to Title 18, United States

Code, Sections 981(b), 2320(b), and 2323(a)(1)(C), as any property, constituting or derived from

any proceeds obtained directly or indirectly as a result of the commission of trafficking in

counterfeit goods, and Title 18, United States Code, Section 2323(a)(1)(B), as any property used,

or intended to be used, in any manner or part to commit or facilitate the commission of trafficking

in counterfeit goods.  I respectfully submit that criminal seizure and forfeiture is authorized

pursuant to Title 18, United States Code, Section 2323(b) (incorporating Title 21, United States

Code, Section 853), and Title 21, United States Code, Section 853(f).

7.       For any civil forfeiture action, Title 18, United States Code, Section 984, provides

that, in any civil forfeiture action in which the subject property is cash or funds deposited into a

financial institution, the Government does not have to identify the specific property involved in

the offense that is the basis for the forfeiture.  Identical property found in the same account as the

property involved in the forfeiture offense is subject to forfeiture; it is no defense that said

property has been removed and replaced by identical property.  In essence, Section 984 allows the

Government to seize for civil forfeiture identical property found in the same place where the

"guilty" property had been kept.  Section 984 applies to civil forfeiture actions commenced within

one year from the date of the offense.

8.       The issuance of the seizure warrant in this district is appropriate under Title 18,

United States Code, Sections 981(b)(2) and (3), and Title 28, United States Code, Section

1355(b)(1), because notwithstanding the provisions of Rule 41(a) of the Federal Rules of Criminal

Procedure, a seizure warrant may be issued by this Court because acts or omissions giving rise to the forfeiture occurred in the District of Columbia.

### IV.  DEFINITIONS AND TECHNICAL TERMS RELATED TO COMPUTERS AND THE INTERNET

9.      Based on my training, experience, and information I have learned from others, including quotes from the glossary of terms section at the web site http://www.verisign.com/ information-services/naming-services/page002199.html, I provide the following Internet-related definitions and information.

a.  A <u>Domain Name</u> or <u>Internet Domain Name</u> describes "an addressing construct used for identifying and locating computers on the Internet.  Domain names provide a system of easy-to-remember Internet addresses, which can be translated by the Domain Name System (DNS) into the numeric addresses (Internet Protocol (IP) numbers) used by the network.  A domain name is hierarchical and often conveys information about the type of entity using the domain name.  A domain name is simply a label that represents a domain, which is a subset of the total domain name space.  Domain names at the same level of the hierarchy must be unique.  Thus, for example, there can be only one .com at the top-level of the hierarchy, and only one verisign.com at the next level of the hierarchy."

b.  A <u>Domain Name System</u> ("DNS") is "a distributed database of information that is used to translate domain names (which are easy for humans to remember and use) into Internet Protocol (IP) numbers, which are what computers need to find each other on the Internet.  People working on computers around the globe maintain their specific portion of this database, and the data held in each portion of the database is made available to all computers and users on the Internet.  The DNS comprises computers, data files, software, and people working together."

c.  <u>Domain Name Servers</u> ("DNS servers") are computers connected to the Internet that convert, or resolve, domain names into Internet Protocol ("IP") addresses.  For each top-level domain (such as ".com"), there is a single company, called a "registry," that determines which second-level domain resolves to which IP address.  For example, the registry for the ".com" and ".net" top-level domains is VeriSign, Inc., which has its headquarters at 21355 Ridgetop Circle, Dulles, VA 20166.

d.  A <u>Host</u> is "also called a name server.  A computer that has both the software

and the data (zone files) needed to resolve domain names to Internet Protocol (IP) numbers."

e. An <u>Internet Protocol Address</u> ("IP Address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 12.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its designation. An IP address acts much like a home or business street address–it enables computers connected to the Internet to properly route traffic to each other. The assignment of IP addresses to computers connected to the Internet is controlled by Internet Service Providers ("ISP").

f. A <u>Registrant</u> is "the individual or organization that registers a specific domain name with a registrar. This individual or organization holds the right to use that specific domain name for a specified period of time, provided certain conditions are met and the registration fees are paid. This person or organization is the 'legal entity' bound by the terms of the Domain Name Registration Agreement with the registrar. Note that the VeriSign registry provides direct services to registrars only, not Internet end-users. The registry database contains only domain name service (DNS) information (domain name, name server names, and name server Internet Protocol (IP) numbers) along with the name of the registrar that registered the name and basic transaction data. It does not contain any domain name registrant or contact information. Registrars provide direct services to registrants."

g. A <u>Registrar</u> "provides direct services to domain name registrants. The registrar database contains customer information in addition to the DNS information contained in the registry database. Registrars process name registrations for Internet end-users and then send the necessary DNS information to a registry for entry into the centralized registry database and ultimate propagation over the Internet. There are multiple registrars providing registration services through VeriSign."

h. An <u>Internet Domain Name Registry</u> is "an entity that receives domain name service (DNS) information from domain name registrars, inserts that information into a centralized database and propagates the information in Internet zone files on the Internet so that domain names can be found by users around the world via applications such as the world wide web and email. VeriSign is the exclusive registry for the .com and .net top level domains."

i. A <u>URL</u> is a "Universal Resource Locator, an address used to locate Web sites on the Internet (*e.g.*, http://www.verisign.com)."

10.     As part of my duties, I have become familiar with the Internet (also commonly

known as the World Wide Web), which is a global network of computers and other electronic

devices that communicate with each other using various means, including standard telephone

lines, high-speed telecommunications links (*e.g.*, copper and fiber optic cable), and wireless

transmissions, including satellite.  Due to the structure of the Internet, connection between

computers on the Internet routinely cross state and international borders, even when the computers

communicating with each other are in the same state.  Individuals and entities use the Internet for

numerous reasons: to gain access to a wide variety of information; to send information to, and

receive information from, other individuals; to conduct commercial transactions; and to

communicate via electronic mail ("email").  An individual who wants to use Internet email must

first obtain an account with a computer that is linked to the Internet – for example, through a

university, employer, or a commercial service – which is called an "Internet Service Provider" or

"ISP."  Once the individual has accessed the Internet, that individual can use Internet mail

services, including sending and receiving email.  In addition, the individual can visit web sites

(see definition of "Web Site" below) and make purchases from them.

11.     Based on my training, experience, and other research, I am also familiar with the

following terms and concepts related to computers and the Internet:

a.  A <u>Web Site</u> consists of textual pages of information and associated graphic
images.  The textual information is stored in a specific format known as Hyper-
Text Mark-Up Language ("HTML") and is transmitted from the web servers to
various web clients via Hyper-Text Transport Protocol ("HTTP").

b.  <u>Web Site Hosting</u> provides the equipment and services required to host and
maintain files for one or more web sites and to provide rapid Internet connections
to those web sites.  Most hosting is "shared," which means that multiple web sites
of unrelated companies are on the same server in order to reduce associated costs.

6

When a client develops a web site, the client needs a server and perhaps a web hosting company to host it. "Dedicated hosting" means that the web hosting company provides all of the equipment and assumes all of the responsibility for technical support and maintenance of a web site. "Co-location" means a server is located at a dedicated hosting facility designed with special resources, such as a secure cage, regulated power, a dedicated Internet connection, online security, and online technical support. Co-location facilities offer customers a secure place to physically house their hardware and equipment as opposed to keeping it in their offices or warehouse, where the potential for fire, theft, or vandalism is greater.

## V.  DISCUSSION OF PROBABLE CAUSE

12.     This application for seizure warrants arises from an investigation into web sites that there is probable cause to believe are being used in connection with the illegal trafficking of counterfeit goods, as set forth in greater detail below, and from which SAs assigned to the IPR Center have purchased products. Those web sites include those web sites using the Subject Domain Names.

13.     All of the products purchased by the SAs from the Subject Domain Names, as described below, are products that purport to bear marks that are registered with the United States Patent and Trademark Office ("USPTO"). According to the USPTO, a trade mark is a brand name and includes any word, name, symbol, device, or any combination, used or intended to be used, in commerce to identify and distinguish the goods of one manufacturer or seller from goods manufactured or sold by others and indicate the source of the goods and copyrighted materials. Under Title 18, United States Code, Section 2320(e), a "counterfeit" trademark is a spurious or unauthorized mark that is used in connection with trafficking goods, that is identical or substantially similar to a mark registered with the USPTO for use on the type of goods being trafficked and that is likely to cause confusion or mistake.

**A.**   **Seizure of Predecessor Web Site www.amoyhy.com and Background on Web Site www.huayetrade.com**

14.     The IPR Center received a request for an investigation of individuals associated with the operation of the domain name www.amoyhy.com because the Coalition to Advance the Protection of Sports Logos ("CAPS") had received complaints that the domain name was being used to facilitate the sale of counterfeit consumer goods, namely, professional sports team apparel bearing counterfeit trademarks.

15.     As part of an earlier investigation in or about October and November 2010, SAs accessed the www.amoyhy.com web site and followed the directions to place an order for what appeared to be trademarked sports team apparel.  Shortly thereafter, the SAs received from the individuals operating this web site packages containing apparel.  On a total of three separate occasions, the SAs placed orders and received apparel in this manner.  All of the apparel received was determined to be counterfeit sports team apparel.

16.     In the course of placing two of the three under-cover orders through www.amoyhy.com in or about October and November 2010, the SAs were directed to pay for their purchases using a Paypal account in the name of jasonwholesale@gmail.com.  The emails directing the SAs to the jasonwholesale@gmail.com Paypal account were sent from the email address amoyhy@188.com and referenced Huaye International Trade Co., Ltd.

17.     On or about November 24, 2010, in coordination with the IPR Center, ICE HSI New York office seized the domain name www.amoyhy.com based on a seizure warrant issued by the United States District Court for the Southern District of New York.  Soon thereafter, HSI agents uncovered that the web site was operating under another domain name,

8

www.huayetrade.com.  In other words, it was the same web site as the one seized on November 24, 2010; only the domain name had changed.

18.     Like its predecessor www.amoyhy.com, the web site www.huayetrade.com sells (and has sold) only sports jerseys that purport to be from various professional and collegiate sports leagues in the United States and Canada, including Major League Baseball ("MLB"), the National Football League ("NFL"), the National Basketball Association ("NBA"), and the National Hockey League ("NHL").  Based on your affiant's training and experience, and work with private investigators and/or trademark protection representatives hired by the aforementioned professional sports leagues, all of the products sold through the web site appear to be counterfeit. The web site www.huayetrade.com is not an authorized distributor of genuine jerseys on behalf of the MLB, NFL, NBA, NHL or The Collegiate Licensing Company ("CLC").

19.     A search of the publicly available WHOIS domain name registration records revealed that the listed registrant for Subject Domain Name www.huayetrade.com was China Trade Lin, 2Xiamen, Fu Jian, China 361100, and that the web site was established on July 28, 2010.  The registrar is Guangzhou Ming Yang Information Technology Co., Ltd, 6th floor Western Building No. 138 Zhongshan Avenue, Tianhe, Guangzhou 510630, China.  Publicly available WHOIS records also revealed that the Subject Domain Name www.huayetrade.com is hosted on a computer assigned IP address: 98.126.73.196, which is owned by a hosting company, VPLS Inc. d/b/a Krypt Technologies, located at 1744 W. Katella Ave., Suite 200, Orange, CA 92867.

20.     Based upon my experience and training, individuals who sell counterfeit goods on the Internet, like those individuals operating www.amoyhy.com and www.huayetrade.com, often

9

register more than one domain name so that, if one domain name is seized, the same content can

become quickly active on another, preregistered domain name.

**B.     First Under-Cover Purchase of Counterfeit Sports Apparel from
        www.huayetrade.com Paid to the Paypal account of jasonwholesale@gmail.com**

21.     The IPR Center conducted an under-cover operation to determine whether the web

site www.huayetrade.com was illegally selling infringing products.

22.     On June 13, 2011, an SA accessed the www.huayetrade.com web site and followed

the directions to place an order for an NBA New York Knicks  (#1 Stoudemire) jersey and an

MLB Philadelphia Phillies (#33 Lee) jersey.  The SA added these items to his cart and proceeded

to checkout.  The web page displayed the shopping cart that contained the items that the SA had

selected and the corresponding prices for each item. The SA continued through the checkout

process by inputting all of the billing and shipping details, including an email address that he had

established earlier.  Upon completion, the SA received an order number of HY2099.

23.     On June 13, 2011, the SA received an email from amoyhy@188.com titled "PayPal

Invoice HY2099," verifying the purchase.  (As set forth above, amoyhy@188.com is the same

email address from which SAs received communications when they made undercover purchases

from www.amoyhy.com in October and November 2010.)  The email referenced Huaye

International Trade Co., Ltd. and was signed by "Lin," just as the emails related to the purchases

from www.amoyhy.com in or about October and November 2010 had referenced.  The email also

directed the SA to pay for the purchase by making payment to a Paypal account in the name of

jasonwholesale@gmail.com.  The email listed the cost of the two jerseys at a discounted price of

$62.00.

24.     On June 23, 2011, the SA made payment for $62.00 to the jasonwholesale@gmail.com Paypal account.  On the same date, the SA received a confirmation from PayPal that the payment had been made.

25.     On June 23, 2011, the SA received an email from amoyhy@188.com acknowledging receipt of payment.

26.     On July 5, 2011, the SA retrieved the packages from the under-cover post office box in the District of Columbia, which contained the jerseys ordered from www.huayetrade.com on June 13, 2011.

27.     On or about September 26, 2011, a CAPS brand protection representative examined detailed digital photos of  the two jerseys received from www.huayetrade.com with the purported registered trademarks from the New York Knicks (an NBA team) and the Philadelphia Phillies (an MLB team). The representative was trained and employed by Trademark Management, a company certified by numerous trademark holders, including the NBA and MLB, to identify counterfeit merchandise.  The representative informed HSI agents that the two sports jerseys received from www.huayetrade.com and paid for using the jasonwholesale@gmail.com Paypal account were counterfeit and were not manufactured by the rights holders or their designee.  Specifically, the representative stated that the jerseys contained counterfeit trademarks, lacked authentic holograms, had improper labeling, and were of poor quality and craftsmanship.

**C.     Second Under-Cover Purchase of Counterfeit Sports Apparel from www.huayetrade.com Paid to the Paypal account of jasonwholesale@gmail.com**

28.     On August 31, 2011, the same SA placed another order with the www.huayetrade.com web site.  This time, the SA placed an order for an MLB Baltimore Orioles

(#34 Arrieta) jersey and a NFL Chicago Bears (#90 Peppers) jersey.  The SA followed the same procedure as he had on June 13, 2011, when purchasing these two jerseys.  Upon completion, the SA received an order number of HY2145.

29.     On September 6, 2011, the SA made payment for $91.98 to the jasonwholesale@gmail.com Paypal account. On the same date, the SA received a confirmation from PayPal that the payment was made.

30.     On September 6, 2011, the SA received an email from amoyhy@188.com acknowledging receipt of payment.  On September 7, 2011, the SA received another email from amoyhy@188.com, which provided a tracking number for the order.

31.     On September 15, 2011, the SA retrieved a package from the under-cover post office box in the District of Columbia, which contained the jerseys ordered from www.huayetrade.com on August 31, 2011.

32.     On or about September 26, 2011, a CAPS brand protection representative examined detailed digital photos of the two jerseys received from www.huayetrade.com with the purported registered trademarks from the Chicago Bears (an NFL team) and the Baltimore Orioles (an MLB team).  The representative was trained and employed by Trademark Management, a company certified by numerous trademark holders, including the NFL and MLB, to identify counterfeit merchandise.  The representative informed HSI agents that the two sports jerseys received from www.huayetrade.com and paid for using the jasonwholesale@gmail.com Paypal account were counterfeit and were not manufactured by the rights holders or their designee.  Specifically, the representative stated that the jerseys contained counterfeit trademarks, lacked authentic holograms, had improper labeling, and were of poor quality and craftsmanship.

12

**D.**     **Aborted Under-Cover Purchase of Counterfeit Sports Apparel from Web Site
www.huayetrade.com**

33.     On October 20, 2011, the same SA placed another order with the

www.huyayetrade.com web site.  This time, the SA placed an order for an NFL Tennessee Titans

(#18 Britt) jersey.  When purchasing this jersey, the SA followed the same procedure as he had for

the previous ones on June 3, 2011, and August 31, 2011.

34.     On October 20, 2011, the SA received an email from amoyhy@188.com, titled

"Unfinished Jersey order HY2179," verifying the purchase and directing the SA to pay for the

purchase using a Paypal account in the name of jasonwholesale@gmail.com.  The email

referenced Huaye International Trade Co., Ltd. and was signed by "Lin."  The email listed the cost

of the jersey as $45.99.

35.     On October 21, 2011, the SA sent an email to "Lin" at amoyhy@188.com

cancelling the order.  On the same day, the SA received an email from amoyhy@188.com

acknowledging cancellation of the order.  The email from amoyhy@188.com referenced Huaye

International Trade Co., Ltd. and was signed by "Lin."

**E.**     **PayPal Records for jasonwholesale@gmail.com**

36.     On November 10, 2011, PayPal placed the jasonwholesale@gmail.com account on

restricted status, freezing the funds for 180 days, because a customer filed a complaint after

receiving a jersey that was alleged to be counterfeit.  As of November 11, 2011, the Paypal

account of jasonwholesale@gmail.com held $36,052.29.

37.     An examination of the PayPal records associated with the

jasonwholesale@gmail.com Paypal account, account number xxxxxxxxxxxxxx7276, revealed

the following:

 a.  The account was opened on or about January 5, 2010;

 b.  The account registration information listed jasonwholesale@gmail.com as the primary email contact address and listed jerseysfactory10@gmail.com; jerseyboys001@gmail.com; canada.jerseys.lucy@gmail.com; americajersey2010@gmail.com; and adasmith0908@gmail.com as additional email addresses associated with the account.  In other words, PayPal payments made to the foregoing email addresses were all ultimately crediting the same Paypal account, account number xxxxxxxxxxxxxxx7276, such that payments made to, for example, jerseysfactory10@gmail.com would be credited to the same PayPal account as payments made to jasonwholesale@gmail.com;

 c.  A total of 5,174 payments/transactions had been made to the account for the period May 17, 2010, to November 11, 2011 (the entire period for which PayPal reflects transactions in this account);

 d.  Those payments/transactions totaled $1,050,556.14;

 e.  Of those payments/transactions, 4,145 payments/transactions listed United States shipping addresses, totaling $845,289.86 after subtracting PayPal's fees;

 f. Of the 5,174 payments/transactions, 4,647, or 89.81%, are associated with the jasonwholesale@gmail.com email address.  The remainder are associated with the other email addresses as follows: jerseysfactory10@gmail.com (36 transactions); jerseyboys001@gmail.com (110 transactions); canada.jerseys.lucy@gmail.com (287 transactions); americajersey2010@gmail.com (38 transactions); and adasmith0908@gmail.com (56 transactions);

 g.  Of the 5,174 payments/transactions, approximately 988 payments/transactions (i) used the term "jersey" or "jerseys" or otherwise referred to a professional sports team or athlete in the optional "Subject" or "Note" field for the transaction (a field completed by each individual PayPal user during their transaction); and/or (ii) referred to the term "jersey" or "jerseys" in the email address of the individual PayPal user making a payment to the account of jasonwholesale@gmail.com; and/or (iii) the individual PayPal user made a payment to an account which referred to the  term "jersey" or "jerseys" in its email address and that account is associated with and linked to the jasonwholesale@gmail.com PayPal account. Such references give probable cause to conclude that those transactions involve the purchase of counterfeit sports jerseys.  Thus, 19.09% of the total transactions in the

account had some description referring to the purchase of sports jerseys.  Similarly, of the 4,145 transactions listing a United States shipping address, 19.30% referenced "jersey" or "jerseys" in at least one of the three above-mentioned PayPal fields; and

h.  Virtually none of the remaining 80.91% of the transactions provided any indication in the optional "Subject" or "Note" field as to the substance of the transaction or reason for the payment (other than PayPal's default setting of "You've got money!").  The investigation uncovered no instances in which the optional "Subject"/"Note" field indicated that the substance or reason for the transaction was inconsistent with the purchase of counterfeit jerseys.

38.     The emails from amoyhy@188.com that the SA received verifying his June 13, 2011 purchase and directing him to pay using the jasonwholesale@gmail.com PayPal account provided the following instruction: "If you want to leave anything while payment, just leave your email, thanks! [*sic*]"  In the emails from amoyhy@188.com verifying the SAs' October and November 2010 purchases (from www.amoyhy.com) and aborted October 20, 2011 purchase (from www.huayetrade.com), the instruction was: "By the way,when you pay by paypal,pls don't write your order in the paypal but your email address [*sic*]" (including the same typographical errors and misspellings).  Based on my training and experience, I believe that these instructions direct purchasers not to write anything in the optional "Subject"/"Note" field while paying for purchases via PayPal, except for their email address, in order to conceal the counterfeit nature of the goods sold.

39.     An examination of the PayPal records associated with the jasonwholesale@gmail.com PayPal account revealed that there were 102 completed outgoing wire transfers totaling $1,034,849.00 between June 8, 2010, and November 3, 2011.  The PayPal account records indicated that 88 wire transfers totaling $894,191.00 were sent to the Industrial and Commercial Bank of China, Fujian Provincial Branch, to account number

15

XXXXXXXXXXXXXXXX7 028 between June 8, 2010, and August 1, 2011. The PayPal account records also indicated that 14 wire transfers totaling $140,658.00 were sent to the Bank of China Limited, Fujian Branch, to account number XXXXXXXXXXXXXXXX7 338 between August 31, 2011, and November 3, 2011.

40.      HSI agents executed a search warrant of the jasonwholesale@gmail.com email account.  A review of messages therein demonstrated that the largest category of messages received by the account were automatically generated email messages from PayPal confirming payments received to the jasonwholesale@gmail.com Paypal account.  In addition, the investigation revealed emails from jasonwholesale@gmail.com to various third parties advertising jerseys and attaching "stock lists" of the sports jerseys of various trademark holders, such as the NFL, MLB, NBA, and the NHL.  Similar advertisements, including attached "stock lists," were sent from amoyhy@188.com to the SAs who purchased counterfeit jerseys from www.amoyhy.com in October and November 2010 and, at a different under-cover email address, to the SA who purchased counterfeit jerseys from www.huayetrade.com in June, August, and December 2011.

41.      A review of the email messages in the jasonwholesale@gmail.com account revealed no discussion of other business activity, goods sold, services provided, or any other communications regarding the substances of the payments to the jasonwholesale@gmail.com Paypal account.

42.      Based on the foregoing, there is probable cause to conclude that the Paypal account of jasonwholesale@gmail.com, bearing the account number xxxxxxxxxxxxxxx7276, contains funds that constitute or are traceable to the proceeds of trafficking in counterfeit goods.

**F.**     **Other Publicly Available Records Related to jasonwholesale@gmail.com**

43.     Open source indices indicate that jasonwholesale@gmail.com is associated with a company named Jason International Trade Co., Ltd. That company is linked to a web site, www.ni-oki.com.

44.     The web site www.ni-oki.com purports to be operated by Jason International Trade Co., Ltd., which represents itself as a manufacturer of sports jerseys. The web site www.ni-oki.com displays numerous pictures of various sports wear. ("Sports wear" as used in this paragraph is meant to indicate clothing that does not include the sports jerseys for professional teams.) Although it displays such products, the web site www.ni-oki.com does not itself provide any option, portal, link, or other means by which to place an order for any such products on the web site itself. Moreover, although the web site www.ni-oki.com does not itself display photos of sports jerseys for sale, the site nonetheless has a disclaimer stating that "if jerseys get lost by unexpected reasons like customs..we also ship again swfitly [*sic*]." An identical disclaimer appears on the www.huayetrade.com web site, including the same misspelling.

**G.**     **Background on Web Site www.jerseys-factory.com**

45.     During the course of their investigation, HSI agents discovered that another web site, www.jerseys-factory.com, was linked to www.huayetrade.com. The web site www.jerseys-factory.com, which advertises "Cheap Jerseys From China," displayed numerous NFL, NHL, NBA, and MLB team trademarked apparel for sale. The web site www.jerseys-factory.com is not an authorized distributor of genuine jerseys on behalf of the MLB, NFL, NBA, NHL, or CLC.

46.     HSI's investigation revealed that the web site www.jerseys-factory.com was linked to the web site www.huayetrade.com for the following reasons:

17

a.  A review of the Paypal account of jasonwholesale@gmail.com, the Paypal account associated with www.huayetrade.com, indicated processing of suspect jersey orders through the email address jerseysfactory10@gmail.com. According to the www.jerseys-factory.com web site, the email address jerseysfactory10@gmail.com corresponds to the web site www.jerseys-factory.com;

b.  On the web page containing contact information for www.jerseys-factory.com, the company lists the following email addresses in addition to jerseysfactory10@gmail.com: jerseysfactory@188.com, jerseysfactory10@yahoo.com, jerseysfactory10@hotmail.com, and huaye03@aol.com;

c.  A search of the publicly available domain name registration records revealed that the listed registrant for the domain name www.jerseys-factory.com is Huaye Trade Co., Ltd. and provides the name Lin Jianshan. The administrative, technical, and billing contacts of www.jerseys-factory.com all listed the email address amoyhy@qq.com. As stated above, the predecessor domain name www.amoyhy.com is the seized domain name under which the web site www.huayetrade.com also operated. Most communications during the course of purchasing counterfeit goods from www.huayetrade.com have been through a similar email address, www.amoyhy@188.com, with an individual named "Lin" and a signature referencing Huaye International Trade Co., Ltd.;

d.  The domain names www.jerseys-factory.com and www.huayetrade.com are both registered with Guangzhou Ming Yang Information Technology Co., Ltd. and are both hosted by the same hosting company in the United States, VPLS Inc. d/b/a Krypt Technologies. Specifically, records for the Subject Domain Name www.jerseys-factory.com revealed that the registrar for www.jerseys-factory.com is Guangzhou Ming Yang Information Technology Co., Ltd, 6th floor Western Building No. 138 Zhongshan Avenue, Tianhe, Guangzhou 510630, China. WHOIS records also revealed that the Subject Domain Name www.jerseys-factory.com is hosted by a computer owned by VPLS Inc. d/b/a Krypt Technologies located at 1744 W. Katella Ave., Suite 200, Orange, CA 92867.  The web site www.jerseys-factory.com was established on January 21, 2010.

**H.    Third Under-Cover Purchase of Counterfeit Sports Apparel from Web Site www.huayetrade.com**

47.    Following the seizure of the jasonwholesale@gmail.com Paypal account on

November 10, 2011, the same SA placed another order with the www.huayetrade.com web site.

This time, on December 19, 2011,  the SA placed an order for an NFL New York Giants (#90 Pierre-Paul) jersey and an NFL Carolina Panthers (#1 Newton) jersey.  The SA followed the same procedure as he had on June 13, 2011, and August 31, 2011, when purchasing the two jerseys.

48.     On December 19, 2011, the SA received an email from amoyhy@188.com, titled "Unfinished Jersey order HY2260," verifying the purchase and directing the SA to pay for the purchase using a Paypal account in the name of yu3ying@gmail.com.  The email referenced Huaye International Trade Co., Ltd. and was signed by "Lin."  The email listed the cost of the two jerseys as $60.00.

49.     On December 22, 2011, the SA made payment for $60.00 to the yu3ying@gmail.com Paypal account.  On the same date, the SA received a confirmation from PayPal that the payment was made.

50.     On December 22, 2011, the SA received an email from amoyhy@188.com acknowledging receipt of payment.

51.     On January 5, 2012, the SA retrieved the packages from the under-cover post office box in the District of Columbia, which contained the jerseys ordered from www.huayetrade.com on December 19, 2011.

52.     On or about January 11, 2012, a CAPS brand protection representative examined detailed digital photos of the two jerseys received from www.huayetrade.com with the purported registered trademarks from the New York Giants and the Carolina Panthers (both NFL teams). The representative was trained and employed by Trademark Management, a company certified by numerous trademark holders, including the NFL, to identify counterfeit merchandise.  The representative informed HSI agents that the two sports jerseys received from

19

www.huayetrade.com and paid for using the yu3ying@gmail.com Paypal account were counterfeit and were not manufactured by the rights holders or their designee.  Specifically, the representative stated that the jerseys contained counterfeit trademarks, lacked authentic holograms, had improper labeling, and were of poor quality and craftsmanship.

53.     Based upon my experience and training, web sites that sell counterfeit goods and operate in the same way as those operating www.huayetrade.com often change the Paypal account used in order continue operating after PayPal has restricted an account.

**I.     PayPal Records for yu3ying@gmail.com**

54.     An examination of the PayPal records associated with the yu3ying@gmail.com Paypal account, account number xxxxxxxxxxxxxxx2866, revealed the following:

a.  The account was opened on or about August 17, 2010;

b.  The account registration information listed yu3ying@gmail.com as the primary email contact address and listed whiteblue22@gmail.com; jlewis0504@gmail.com; kettyrose456789@gmail.com; and randysmith6789@gmail.com as additional email addresses associated with the account;

c.  A total of 803 payments/transactions had been made to the account for the period February 26, 2011, to January 30, 2012 (the entire period for which PayPal reflects transactions in this account);

d.  Those payments/transactions totaled $193,078.95;

e.  Of the total of 803 payments/transactions, 634 transactions/payments listed United States shipping addresses, totaling $154,945.52 after subtracting PayPal's fees;

f.  Of the total of 803 payments/transactions, approximately 40 payments/transactions either (i) used the term "jersey" or "jerseys" or otherwise referred to a professional sports team or athlete in the optional "Subject" or "Note" field for the transaction (a field completed by each individual PayPal user during their transaction); and/or (ii) referred to  the  term "jersey" or "jerseys" in the email

address of the individual PayPal user making a payment to the account of yu3ying@gmail.com.  Such references give probable cause to conclude that those transactions involve the purchase of counterfeit sports jerseys.  Thus, 4.98% of the total transactions in the account had some description referring to the purchase of sports jerseys;

g.  Virtually none of the other 95.02% of the transactions provided any indication in the optional "Subject" or "Note" field as to the substance of the transaction or reason for the payment (other than PayPal's default setting of "You've got money!").  The investigation uncovered no instances in which the optional "Subject" or "Note" field indicated that the substance or reason for the transaction was inconsistent with the purchase of counterfeit jerseys; and

h.  A review of the customer/purchaser name and email information revealed substantial overlap between the customers/purchasers making payments to the Paypal account of jasonwholesale@gmail.com and those making payments to the Paypal account of yu3ying@gmail.com.   In other words, a large number of the customers/purchasers making payments to the Paypal account of yu3ying@gmail.com also made payments to the Paypal account of jasonwholesale@gmail.com in a separate transaction.  For example, of the 803 payments/transactions listed in the yu3ying@gmail.com Paypal account records for the period February 26, 2011, to January 30, 2012, 460 of those payments were from customers/purchasers who also made payments to the jasonwholesale@gmail.com Paypal account.  Thus, 57.28% of the payments into the account were from customers who made payments, at different times, to both the yu3ying@gmail.com and jasonwholesale@gmail.com Paypal accounts.  This gives further probable cause to conclude that those transactions involve the purchase of counterfeit sports jerseys.

55.    An examination of the PayPal records associated with the yu3ying@gmail.com

Paypal account revealed that there were 26 completed outgoing wire transfers totaling

$161,617.00 between March 18, 2011, and December 28, 2011. The Paypal account records

indicated that 10 wire transfers totaling $63,573.00 were sent to the Bank of China, Fujian

Branch, to account number XXXXXXXXXXXXXXX7091 between March 18, 2011, and

November 11, 2011.  The date of the last wire transfer from this account is the day after PayPal

froze the jasonwholesale@gmail.com Paypal account.  Thereafter, there were 16 wire transfers

totaling $115,837.00 to a different Bank of China account, account number

XXXXXXXXXXXXXXX0 354.  This latter account is associated with both Bank of China,

Fujian Branch, and Bank of China, Xiamen Branch, both of which are in Fujian Province, China.

56.     On January 29, 2012, PayPal placed the yu3ying@gmail.com account on restricted

status, freezing the funds for 180 days, because a customer filed a complaint after receiving a

jersey that was alleged to be counterfeit.  As of March 12, 2012, the Paypal account of

yu3ying@gmail.com held $18,704.37.

57.     Based on the foregoing, there is probable cause to conclude that the Paypal account

of yu3ying@gmail.com, bearing the account number xxxxxxxxxxxxxxx2866, contains funds that

constitute or are traceable to the proceeds of trafficking in counterfeit goods.

## VI.  SEIZURE PROCEDURE

58.     As detailed in Attachment A, upon execution of the seizure warrant, the registry

for the ".com" and ".net" top-level domain, VeriSign, Inc., headquartered at 487 East Middlefield

Road, Mountain View, CA 94043, and its registry division at 21355 Ridgetop Circle-Lakeside III,

Dulles, VA 20166 ("VeriSign"), shall be directed to restrain and lock the Subject Domain Names

pending transfer of all right, title, and interest in the Subject Domain Names to the United States

upon completion of forfeiture proceedings, to ensure that changes to the Subject Domain Names

cannot be made absent court order or, if forfeited to the United States, without prior consultation

with ICE.

59.     In addition, upon seizure of the Subject Domain Names by HSI, VeriSign will be

directed to point the Subject Domain Names to a particular IP address, which will display a web

page notifying users, including the registrants, of the seizure of the Subject Domain Names.

60.     Upon completion of forfeiture proceedings, all Domain Name Records for the

Subject Domain Names will be changed to reflect the transfer of ownership to the United States.

## **CONCLUSION**

As described above, individuals associated with the Subject Domain Names and the

Subject Funds shipped the under-cover agents infringing counterfeit trademarked goods.  Thus,

there is a substantial connection between the Internet sites bearing the domain names

www.huayetrade.com and www.jerseys-factory.com, the domain names themselves, and the

offenses listed above.  The Subject Domain Names facilitated the trafficking in counterfeit goods.

The Subject Funds constitute the proceeds of trafficking in counterfeit goods.

The statements above are true and accurate to the best of my knowledge and belief.


_____
                Satish Mathai
                Special Agent
                Immigration and Customs Enforcement

Subscribed to and sworn before me on this 21st day of March, 2012.


_____
                JOHN M. FACCIOLA
                UNITED STATES MAGISTRATE JUDGE